

# THE ATTORNEY GENERAL
# OF TEXAS

## AUSTIN 11, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

April 26, 1950

Hon. J. M. Falkner
Commissioner
Department of Banking
Austin, Texas

Dear Mr. Falkner:

Opinion No. V-1046.

Re: The legality of a bank's main-
taining deposit facilities in a
garage building attached to a
bank building by a tunnel be-
low the street.

     In your letter requesting our opinion relative to the cap-
tioned matter you state that

> "A bank presently operating in a bank house own-
> ed by it desires to construct an appropriate garage
> building on another lot directly across the street from
> its present banking house and the garage building is to
> be permanently and structurally attached to the present
> bank building by a tunnel suitable for passage back and
> forth, and will contain a drive-in deposit window or
> windows."

     You have inquired whether this plan contravenes Article
XVI, Section 16, of the Texas Constitution, or Chapter IX, Article 3,
of the Texas Banking Code of 1943.

     We set out the pertinent constitutional and statutory pro-
visions. Article XVI, Section 16, provides:

> "The Legislature shall by general laws authorize
> the incorporation of corporate bodies with banking and
> discounting privileges, . . .

> "Such body corporate shall not be authorized to
> engage in business at more than one place which shall
> be designated in its charter."

     Chapter IX, Article 3, of the Texas Banking Code of 1943,
codified as Article 342-903, V.C.S., provides:

> "No state, national or private bank shall engage
> in business in more than one place, maintain any branch
> office, or cash checks or receive deposits except in its
> own banking house."

The exact purpose of the foregoing Article is to prohibit branch banking. This is clearly indicated in its caption, where it is provided that it is:

"An act to accomplish the constitutional directive expressed in Article XVI, Section 16, . . . . This Act . . . . prohibits branch banking. . . ."

It is said in Banks and Banking, Zollman, Permanent Edition, Volume 2, Section 1295, that:

"Branch banks are not mere 'teller's windows,' but are so many integral parts or offices or agencies of discount belonging to the mother corporation."

We do not think what is proposed to be done by the bank in question comes within the constitutional or statutory inhibitions applicable to branch banking.

Three excellent annotations on the constituent elements of branch banking are found in 30 A.L.R. 927, 50 A.L.R. 1340, and 136 A.L.R. 471. A Kentucky case, which goes even further than we would attempt or need to do to answer this question, is Marvin v. Kentucky Title Trust Co., 218 Ky. 135, 291 S.W. 17 (Ky. Ct. App. 1927). In Kentucky, branch banking had been held unauthorized under their applicable statute. In the case cited, the question arose as to the authority of a licensed bank to open a separate office to receive deposits and cash checks, and nothing more, for customers of the principal bank. The Court said:

"We have held that a bank organized under the laws of this State has no right to establish a branch bank. Bruner v. Citizens' Bank, 134 Ky. 283, 120 S.W. 345. Both parties concede the binding force of this opinion, the controverted question being as to whether appellee's plan to open offices for the receipt of deposits and payment of checks will constitute the establishment of branch banks, so that the case may be said to turn upon the definition of banking. . . .

". . . We think the . . . definition from Warren v. Shook, supra, peculiarly apt: 'Having a place of business where deposits are received and paid out on checks, and where money is loaned upon security, is the substance of the business of a banker.

"It follows that the proposed plan does not fall within the inhibition of the Bruner Case, supra, as to the establishment of branch banks, nor does it conflict

with that opinion in any other particular. Banks are the depositories of most of the funds of the country, and the above decision is based on the principle that they are quasi public institutions established and regulated by statute. The safety of the funds is carefully guarded, and this calls for the exercise of discretion and direct control upon the part of the directors and chief officers in the matter of loans, discounts, investments, and other like duties. Branch banks in effect carry on the same business as that conducted by the parent institution without being subject to the safeguards thrown around the establishment and administration of the latter, and therefore such branches are not only unauthorized by the statute but impliedly inhibited by it. That opinion, however, expressly recognizes the right of a bank to 'have as many duly appointed agents as its needs require, and these agents, among other things, may receive and forward to it at its place of business the money of persons who desire to deposit with it.'

"In principle the same rule would apply to agents who merely receive deposits and pay out checks on demand, duties that are incidental to the business, but which do not require special discretion and business acumen. The paying teller of a bank should have a technical knowledge of handwriting and be able to detect forgeries and identify signatures, and both he and the receiving teller should be accurate in their calculations. But neither of these agents can loan money or invest the banking funds, and the fact that these minor duties are carried on at more than one place in no wise affects the bank's solvency. For illustration: If a bank occupies an entire city block, can it be doubted that it can establish an office for the receipt of deposits and payment of checks at each corner of its building and keep separate books at each place? Clearly the installation of such offices in the building is incidental to that business, and such an arrangement would have no injurious effect upon the financial management and control of the bank's business, as the officials charged with these duties do not devote their time to the details of the receipt of deposit or payment of checks. . ." (Emphasis supplied.)

It is our opinion that the proposed plan would not constitute a "branch bank."

Article 342-903, V.C.S., in addition to prohibiting branch banks, provides:

"No state, national or private bank shall . . . cash checks or receive deposits except in its own banking house."

If the new structure, when built, becomes a part of the bank's "banking house" then the proposed plan will not viblate the provisions of said Article.

The contemplated new structure, although to be erected across the street from the original "banking house," will be physically joined thereto by a tunnel under the street, which you state will be suitable for passage back and forth. It is evident that besides being joined physically, the new structure, including the passageway, will be in close proximity to the present building. It will be used in connection with the original building and as a unit will be devoted to one general common purpose. It is our opinion that the two structures will in reality be one and when used in the manner proposed will constitute the bank's "banking house." To hold that said Article requires deposits to be made in a bank's original banking building, and not in an addition thereto would sacrifice the real spirit of the law to pure literalism.

This opinion is necessarily limited to the factual situation presented.

## SUMMARY

A new structure erected across the street from a bank's "banking house" and connected therewith by a tunnel suitable for passage back and forth and used to receive deposits does not contravene the provisions of Article XVI, Section 16, of the Texas Constitution, nor of Article 342-903, V.C.S., relative to branch banking or the receiving of deposits by a bank at a place other than its banking house.

Yours very truly,

PRICE DANIEL
Attorney General

By *W. V. Geppert*

W. V. Geppert
Assistant

APPROVED:

Joe Greenhill
First Assistant

Price Daniel
Attorney General

WVG/mwb